**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
WEST PALM BEACH DIVISION

Case No.:_____

TOWN OF GULF STREAM, a municipality organized
and existing under the laws of Florida on its own
behalf and on behalf of those municipalities similarly
situated, and WANTMAN GROUP, INC., a domestic
company on its own behalf and on behalf of those
companies similarly situated,

       Plaintiffs,

vs.

MARTIN E. O'BOYLE, an individual, CHRISTOPHER
O'HARE, an individual, WILLIAM RING, an
individual, JONATHAN R. O'BOYLE, an individual, DENISE
DEMARTINI, an individual, GIOVANI MESA, an individual,
NICKLAUS TAYLOR, an individual, RYAN WITMER, an
individual, AIRLINE HIGHWAY, LLC, COMMERCE GP, INC.,
CG ACQUISITION CO., INC., CRO AVIATION, INC., ASSET
ENHANCEMENT, INC., COMMERCE REALTY GROUP, INC.,
PUBLIC AWARENESS INSTITUTE, INC., CITIZENS
AWARENESS FOUNDATION, INC., OUR PUBLIC RECORDS,
LLC, STOPDIRTYGOVERNMENT, LLC, COMMERCE
GROUP, INC., and THE O'BOYLE LAW FIRM, P.C., INC.,

       Defendants.

_____/

**CLASS ACTION**

## CLASS ACTION COMPLAINT

### I.    Introduction.

    1.    The TOWN OF GULF STREAM ("Gulf Stream" or "Town") brings this lawsuit

as a class action, by and on behalf of state and local municipalities, municipal agencies, and their

private contractors located in the state of Florida that have been victimized by a scheme to defraud and extort being carried out by a RICO Enterprise created by, and composed of, the Defendants. Through their RICO Enterprise, the Defendants have associated-in-fact with the sole purpose of unlawfully and illegally extracting settlement payments from the Class Members by first using the mails and the wires to deliver and advance frivolous public records request that are often intentionally inconspicuous. Then, the Defendants, through their RICO Enterprise, immediately use the mails and the wires to extort their victims by demanding that these municipal entities and agencies immediately settle with them and pay their allegedly incurred attorneys' fees and costs as provided for in the public records statute, or, face protracted litigation and a flurry of additional frivolous public records request and lawsuits. The amount demanded by the Defendants to reimburse them for their attorneys' fees and costs is fraudulent— far exceeding the actual costs and fees incurred in the frivolous public records request, resulting in a profit windfall for the Defendants. At least one Court has labeled these actions as an "unreasonable and flagrant abuse of the state [Public Records Act]," amounting to "nothing more than a scam." (*See* ¶18, p.6, Final Order Denying Relief Under Public Records Act, entered by the Hon. Jack M. Schemer, Circuit Court Judge, Duval County, Florida, attached hereto as **Exhibit "A."**).

2.      The Defendants are prolific in their efforts—from March 5, 2013, through July 17, 2013, the RICO Enterprise filed over 400 public records request with Gulf Stream alone. From August of 2013 through present, the RICO enterprise filed more than 1,500 additional public records requests bringing the total number of public records requests to almost 2,000.

(*See* the Public Records Request Log attached hereto as **Composite Exhibit "B"**).[1]   For purposes of context—Gulf Stream is a tiny community, having a population of 974 residents and only 17 full time employees (four of whom work at Town Hall), with a land mass of less than one square mile.

3.      The Defendants also target private entities that have contracted with municipalities, arguing that by virtue of their business relationship with a public entity, they are subject to the public records laws of Florida.  The Wantman Group, Inc. brings this lawsuit as a class action on behalf of itself and other private entities that have been victimized by Defendants' scheme to defraud and extort.

4.      The Wantman Group is a multidisciplinary consulting firm which provides engineering, surveying and mapping, and environmental and planning services.  The Wantman Group has six offices throughout the state of Florida.  As part of its business, the Wantman Group has signed contracts with various municipalities and government agencies.  For example, the Wantman Group signed a contract with the South Florida Water Management District, ("SFWMD") through which it was to provide professional services to the SFWMD.

## II.      Jurisdictional Allegations.

5.      As this is an action brought under 18 U.S.C. §§ 1961, 1962 and 1964, this Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331.  Additionally, this Court has original jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§ 1964 (a)-(c).  Finally, this Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965.

---

[1] This chart includes all public records request made to the Town, only a handful of which were not done by the Defendants.

6.     Venue is appropriate in this district pursuant to 18 U.S.C. § 1965(a) as well as 28 U.S.C. § 1391(b)(1) and (2), as the Defendants reside in this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

**III.    Parties.**

7.     Plaintiff, TOWN OF GULF STREAM, is a municipality organized and existing under the laws of the State of Florida.

8.     Plaintiff, WANTMAN GROUP, INC., is a Florida corporation, which maintains its principal place of business at 2035 Vista Pkwy, Suite 100, West Palm Beach, Florida, 33411 in Palm Beach County, Florida.

9.     Defendant MARTIN E. O'BOYLE, is a resident of Florida, residing in Palm Beach County, and more specifically, in the Town of Gulf Stream.  Martin O'Boyle is also: (i) the President and owner of Defendants Commerce Group, Inc., Commerce GP, Inc., Commerce Realty Group, Inc., and CRO Aviation, Inc.; (ii) the sole member of Defendants Stopdirtygovernment, LLC, Our Public Records, LLC and Airline Highway, LLC; and (iii) a director of Defendant Public Awareness Institute, Inc.

10.    Defendant WILLIAM F. RING ("Ring") is an attorney licensed to practice law in the state of Florida, and upon information and belief, is practicing with and a partner or shareholder of Defendant The O'Boyle Law Firm, P.C., Inc., as well as its registered agent. Ring is also: (i) Vice-president of Defendants Commerce Group, Inc., CG Acquisition Co., Inc., Commerce Realty Group, Inc., and Asset Enhancement, Inc.; (ii) the founding President of Defendant Citizens Awareness Foundation, Inc., (iii) and the registered agent for Defendants Our

Public Records, LLC, and Stopdirtygovernment, LLC.  Ring has worked for Martin E. O'Boyle in some capacity for at least 25 years.

11.     Defendant CHRISTOPHER O'HARE ("O'Hare") is a resident of Florida, residing in Palm Beach County, and more specifically, the Town of Gulf Stream.  O'Hare is also a client of Defendant The O'Boyle Law Firm, P.C., Inc.

12.     Defendant JONATHAN R. O'BOYLE is a resident of Florida, residing in Palm Beach County, and while not an attorney that is  licensed to practice law in Florida;  he is the founding principal of Defendant The O'Boyle Law Firm, P.C., Inc. and currently its President, sole director and manager.  Jonathan O'Boyle is the son of Defendant Martin O'Boyle, and is also a director of Defendant Public Awareness Institute, Incorporated.

13.     Defendant DENISE DEMARTINI ("DeMartini") is a resident of Florida, residing in Martin County.  DeMartini is also: (i) an employee of Defendant Commerce Group, Inc.; (ii) Secretary of Defendant Commerce Realty Group, Inc.; and (iii) the current President and director of Defendant Citizens Awareness Foundation, Inc.  DeMartini, while not a lawyer, managed the operations of Defendant The O'Boyle Law Firm during the time at issue in this suit.  Like Defendant Ring, DeMartini has worked for Martin O'Boyle for more than 25 years.

14.     Defendant COMMERCE GROUP, INC. ("Commerce Group") is a Florida Corporation with its principal place of business located at 1280 W Newport Center Dr., Deerfield Beach, Florida 33442.  Commerce Group is run by Martin O'Boyle.

15.     Defendant CITIZENS AWARENESS FOUNDATION, INC. ("CAFI"), purports to be a Florida non-profit corporation, with its principal place of business located at 1280 West

Newport Center Drive, Deerfield Beach, Florida 33442.  Defendant Martin O'Boyle, together with his son Jonathan O'Boyle and Defendant Ring, created CAFI in or around January of 2014.

16.     Defendant STOPDIRTYGOVERNMENT, LLC, ("Stopdirtygovernment" or "SDG") is a Florida limited liability company with its sole member being Martin O'Boyle, and its principal place of business located at 1280 West Newport Center Drive, Deerfield Beach, Florida 33442.

17.     Defendant OUR PUBLIC RECORDS, LLC, ("OPR") is a Florida limited liability company with its sole member being Martin O'Boyle, and its principal place of business located at 1280 West Newport Center Drive, Deerfield Beach, Florida 33442.  Defendant Martin O'Boyle created OPR in or around April of 2013.

18.     Defendant PUBLIC AWARENESS INSTITUTE, INC. ("PAI") purports to be a Florida non-profit corporation with its principal place of business located at 1280 West Newport Center Drive, Deerfield Beach, Florida 33442.  Defendants Martin O'Boyle and Jonathan O'Boyle, along with their family member Sheila O'Boyle (wife of Martin and mother of Jonathan), are the directors of PAI, which was created in or around May of 2013.

19.     Defendant AIRLINE HIGHWAY, LLC ("AH") is a Florida limited liability company with its sole member being Martin O'Boyle, and its principal place of business located at 1280 West Newport Center Drive, Deerfield Beach, Florida 33442.

20.     Defendant, COMMERCE GP, INC. ("Commerce GP"), is a Florida profit corporation with its principal place of business located at 1280 West Newport Center Drive, Deerfield Beach, Florida 33442. Defendant Martin O'Boyle is the President of Commerce GP.

21.     Defendant CG ACQUISITION CO., INC. ("CGA"), is a Florida profit corporation with its principal place of business located at 1280 West Newport Center Drive, Deerfield Beach, Florida 33442. Defendant Martin O'Boyle is the Director of CGA with Defendant Ring being its Vice-President.

22.     Defendant, CRO AVIATION, INC. ("CRO"), is a Florida profit corporation with its principal place of business located at 1280 West Newport Center Drive, Deerfield Beach, Florida 33442. Defendant Martin O'Boyle is the President of CRO.

23.     Defendant, ASSET ENHANCEMENT, INC. ("AE"), is a Florida profit corporation with its principal place of business located at 1280 West Newport Center Drive, Deerfield Beach, Florida 33442. Defendant Martin O'Boyle is the President of AE with Defendant Ring being the Vice-President.

24.     Defendant, COMMERCE REALTY GROUP, INC. ("CRG"), is a Florida profit corporation with its principal place of business located at 1280 West Newport Center Drive, Deerfield Beach, Florida 33442. Defendant Martin O'Boyle is the President, Defendant Ring the Vice-President and Defendant DeMartini the Secretary of CRG.

25.     In addition to the fact that they are all housed at the offices of Martin O'Boyle's company Commerce Group, Defendants O'Boyle, Ring, DeMartini, CG, CAFI, SDG, OPR, PAI, AH, Commerce GP, CGA, CRO, AE, CRG all share the internet domain commerce-group.com and utilize the email address records@commerce-group.com.

26.     Defendant, THE O'BOYLE LAW FIRM, P.C., INC., ("O'Boyle Law Firm"), is a foreign corporation, a law firm, having its alleged principal address located at 1001 Broad Street, Johnstown, Pennsylvania and a Florida office at 1286 West Newport Center Drive, Deerfield

Beach, Florida 33442.   Defendant Jonathan O'Boyle is the sole officer and director of the O'Boyle Law Firm, but is not licensed to practice law in the State of Florida. While serving as an officer of Defendant CAFI, a client of the O'Boyle Law Firm, Defendant DeMartini simultaneously managed the O'Boyle Law Firm's operations. After resigning as an officer of CAFI, but retaining his position as an officer of several other firm clients, including Defendants CG, CGA, CRG and AE, Defendant Ring is now a partner with the O'Boyle Law Firm.

27.     Defendant, RYAN WITMER, is an attorney licensed to practice law in the state of Florida and a resident of New York. A law school classmate of Jonathan O'Boyle, Witmer helped to establish the O'Boyle Law Firm and thereafter filed and prosecuted scores of public records lawsuits throughout the State of Florida against the putative class members on behalf of clients of the O'Boyle Law Firm, including, but not limited to, Defendants Martin O'Boyle, O'Hare and CAFI.

28.     Defendant, GIOVANI MESA, is an attorney licensed to practice law in the state of Florida, practicing with the O'Boyle Law Firm.  Mesa has filed and prosecuted scores of public records lawsuits throughout the State of Florida against the putative class members on behalf of clients of the O'Boyle Law Firm including, but not limited to, Defendants Martin O'Boyle, O'Hare and CAFI.

29.     Defendant, NICKALAUS TAYLOR, is an attorney licensed to practice law in the state of Florida since 2008, who practices with the O'Boyle Law Firm. Taylor has filed and prosecuted scores of public records lawsuits throughout the State of Florida against the putative class members on behalf of clients of the O'Boyle Law Firm including, but not limited to,

Defendants Martin O'Boyle, O'Hare, Commerce Group, CAFI, OPR, AH, CGA, CRO, AE and CRG.

**IV.      Appropriateness of Class Action Treatment.**

30.      Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

31.      The proposed Class is defined as:

All state or local municipalities, municipal agencies, or private contractors in the State of Florida, who have been served with a public records request by any of the Defendants and who either (a) paid a settlement amount in conjunction with, or to resolve the public records request; or (b) incurred attorneys' fees and costs to respond to or litigate against public records requests from any of the Defendants.

32.      Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

33.      Plaintiffs do not currently know the exact number of Class Members or their identities.  However, Plaintiffs believe that Class Members number in the hundreds, and are thus sufficiently numerous and geographically dispersed so that joinder of all Class Members is impracticable.

34.      Attached hereto as **Composite Exhibit "C"** are a series of charts listing the current known potential Class Members, along with the style, case number, and county where the lawsuits were brought against them as part of the scheme to defraud and extort.  As composite Exhibit "C" illustrates, there are at least 121 different Class Members (including Plaintiffs)

composed of approximately 31 municipalities or agencies, and 90 private contractors in suits brought in nearly 2 dozen counties around the State.[2]

35.     Plaintiffs further believe that each Class Member, including themselves, have claims with a common origin and share a common basis.  The claims of all Class Members, as well as the Plaintiffs, originate from the Defendants' pattern of racketeering activity and use of the RICO Enterprise to carry out such activities.

36.     The claims of the Plaintiffs are typical of the Class, in that Plaintiffs, like all Class Members, were injured in their business or property by reason of the Defendants' pattern of racketeering activity carried out by the RICO Enterprise, including the predicate acts of mail fraud, wire fraud, and extortion.

37.     The RICO Enterprise, created by the Defendants, used the mail and the wires to send out what is usually an inconspicuous and frivolous public records request to the Class Members, often times under the guise of a false non-profit organization, and with a stated or implied purpose of advancing the public's interest in government transparency.[3]  In reality, this bogus public records request was an essential first-step of the RICO Enterprises' scheme to defraud and extort money from the class members—it was nothing more than bait, a records request for documents that the RICO Enterprise had no intention of reviewing, and instead, intended to be overlooked or missed by the receiving class member so as to trigger the next step in the RICO Enterprises' scheme.

---

[2] Exhibit "C" reflects suits brought by only Defendant CAFI, albeit, in advancing the goal of the RICO Enterprise. Upon information and belief, the number of class members will increase substantially.

[3] The purpose for disguising the identity of the requesting party was twofold: (1) to fool the recipient into thinking a not-for-profit had a genuine desire to see the documents requested; and (2) to try and circumvent the conditional payment provided for in the Public Records law allowing a municipality to condition production of the requested documents on payment of costs and expenses.  (*See*, Fla. Stat. §119.07(4)(d)).

**RICHMAN GREER, P.A.**

**Miami • West Palm Beach**

38.     After the bogus records request was sent and hopefully overlooked, the RICO Enterprise would then use the mail and the wires to: (i) demand a settlement of the records request in excess of the actual attorneys' fees and costs incurred by the Defendants; or (ii) file a frivolous lawsuit against the recipient of the bogus records request followed by the demand for settlement.  The settlement demand was directly or indirectly accompanied by a threat of harm to property in the form of more bogus records requests, to be followed up with even more frivolous litigation.

39.     This racketeering conduct damaged and injured the class members in three ways: (i) by requiring additional expenditures by the class members (i.e. hiring additional staff, paying overtime, etc.) to review and respond to the massive volume of bogus records requests;[4] (ii) by coercing and sometimes extracting an inflated settlement amount from the Class Member to "make this go away,"; and (iii) by requiring the Class Member to defend against several spurious lawsuits brought only to increase the pressure and ultimately force the Class Member to accept the extorted settlement amount.

40.     Pursuant to Rule 23(b)(3), there are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class Members, including whether Defendants:

a.    are associated, organized and acting as an enterprise with the purpose of carrying out a scheme to defraud and extort;

b.    devised, followed, and actively pursued a scheme to defraud and extort, and what the scheme to defraud and extort consisted of, including;

---

[4] *See* note 3, *supra*

i.   manipulation of the public records laws of Florida for financial gain, including the filing of frivolous, meaningless, and often inconspicuous public records request with no real need or intention to ever review or obtain the public records, but rather, simply set the stage for the next step in the scheme to defraud and extort;

ii.   advance fraudulent and inflated settlement demands as a matter of practice, policy, and pattern by fraudulently misrepresenting attorneys' fees incurred by the O'Boyle Law Firm and its co-Defendant clients, including a substantial profit margin to be shared between the O'Boyle Law Firm and its so-called "non-profit" clients;

iii.   as a matter of practice, policy, and pattern, extorted compliance with the fraudulent and inflated settlement demands by threatening scores of additional frivolous public records requests to be followed by scores of additional fraudulent and inflated settlement demands with the sole intended consequence of the class members having to spend  resources on responding to the bogus public records request and defending the frivolous litigation;

iv.   set up false and fraudulent companies, both non-profit and profit, in furtherance of the scheme to defraud, and using the mails and wires to incorporate, indoctrinate, or otherwise create these bogus companies in the State of Florida;

     v.  established a captive Florida law firm run by a non-Florida attorney for the sole purpose of generating attorneys' fees from settlements demanded through the use of the mails and wires;

    c.  have engaged in conduct that constitutes a pattern of racketeering activity in furtherance of their scheme to defraud and extort;

    d.  committed the predicate criminal acts of mail fraud, wire fraud, or extortion in furtherance of their scheme to defraud and extort;

    e.  made false statements or misrepresentations of material fact regarding their identity so as to induce Defendants to act in reliance by foregoing the assessment of a special service charge to which Defendants would otherwise have been entitled under Fla.Stat. § 119.07(4)(d);

41.    Additionally, another common question of law and fact is the appropriate measure of damages sustained by Plaintiffs and other Class Members.

42.    A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense, and risk of inconsistent rulings that numerous individual actions would cause.  Class treatment will also permit the adjudication of relatively small claims by Class Members who otherwise might not be able to afford to litigate their claims individually.  This class action presents no difficulties in management that would preclude maintenance as a class action.

43.     This forum is particularly desirable for the prosecution of this class action because Defendants all are residents in, or maintain a principal place of business in, this district, and presumably maintain many of those corporate records which are particularly germane to this action here.   As a result of the foregoing, litigating on a class action basis in this forum will likely decrease the cost of discovery and prosecution, generally.

44.     Plaintiffs have suffered the harm alleged on behalf of the Class, and have no interests antagonistic to the interests of any other Class Members.   They are committed to the prosecution of this action and have retained counsel experienced in the prosecution of class actions, and in complex commercial actions in particular.   Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.   Plaintiffs are not aware of any other pending litigation concerning this controversy that involves Class Members, other than the individual cases brought by Defendants to enforce the frivolous and fraudulent public records requests.

45.     Finally, the Class is readily definable.

**V.     General Allegations.**

**a.  Florida Public Records Law**

46.     Pursuant to Chapter 119, Florida Statutes, commonly referred to as the Sunshine law, the legislature has determined that: "It is the policy of this state that all state, county, and municipal records are open for personal inspection and copying by any person.   Providing access to public records is a duty of each agency."

47.     Florida prides itself on the transparency required of its elected officials, and its elected officials often pride themselves on providing such transparency to those that have elected them to serve.

48.     Accordingly, pursuant to section 119.07, all qualifying entities: "shall permit the record(s) to be inspected and copied by any person desiring to do so, at any reasonable time, under reasonable conditions…."   In furtherance of this transparency, "a custodian of public records and his or her designee must acknowledge requests to inspect or copy records promptly and respond to such requests in good faith.  A good faith response includes making reasonable efforts to determine from other officers or employees whether such a record exists and, if so, the location at which the record can be accessed."

49.     The Public Records Act authorizes a custodian to collect a fee, prior to disclosing the records, for the cost of copying the records. Fla. Stat. § 119.07(4) (providing the custodian "shall furnish a copy ... of the record upon payment of the fee prescribed by law"). The custodian may also collect a special service charge for requests that "require extensive use of information technology resources or extensive clerical or supervisory assistance ...." (Fla. Stat. § 119.07(4)(d)).

50.     Chapter 119 also extends the transparency requirement, as well as an obligation to respond to public records request, to a "contractor," defined as "an individual, partnership, corporation, or business entity that enters into a contract for services with a public agency and is acting on behalf of the public agency…."  See section 119.0701.

51.     In addition to criminal penalties, public officers (or "contractors") are subject to prevailing party attorneys' fees in civil court upon a showing of "unlawful refus[al] to permit a

public record to be inspected or copied…"  Notably, this prevailing party fee provision is one-sided and can only be invoked by the party making the public records request, and not the agency or contractor responding to the request.

52.      It is this threat of prevailing party attorneys' fees that is the nucleus around which the Defendants created their scheme to defraud and extort, and organized their RICO Enterprise to carry out that scheme.

        **a.   The Origins of the Scheme to Defraud and Extort.**

                *i.  Martin O'Boyle gets a taste of the potential ill-gotten gains associated with exploiting the Public Records Act.*

53.      Martin O'Boyle already had an extensive history filing public records requests in New Jersey, Florida and elsewhere. Martin O'Boyle previously used the public records process in an abusive fashion to file thousands of requests and vexatious and frivolous lawsuits, to cripple local governments into granting his development plans and other demands.

54.      By way of example, in the case of *Martin E. O'Boyle v. Peter Isen*, 2014 WL 340104 (N.J.Super.A.D.)[5], the Superior Court of New Jersey, Appellate Division, noted:

> From September 2007 through early July 2008, plaintiff [Martin O'Boyle] and members of his family filed multiple requests pursuant to the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13. Longport's only clerk worked part-time, and she did not address the requests within the time required by statute. At one point, the clerk went to the emergency room because of the stress she attributed to the flood of OPRA requests. And, in February 2008, the Borough's solicitor notified plaintiff that it would not accept any additional OPRA requests he filed, explaining that the numerous requests were substantially disrupting governmental services. The solicitor claimed that Longport had received 190 requests on October 16 and 17 and thirty filed October 31, 2007.

---

[5] In the *Isen* case, Martin O'Boyle sued a resident of Longport for claiming Martin O'Boyle was "the enemy of Longport". The suit for defamation was dismissed by summary judgment and affirmed by the appellate court.

55.     Similarly, when his daughter was being prosecuted for driving under the influence in Palm Beach County, Florida, Martin O'Boyle inundated the Palm Beach County State Attorney's Office both individually and through some of the other Defendants with over 1,300 requests for public records.

56.     At one point, Martin O'Boyle had an application with four variance requests pending before the Town when his vexatious campaign of public records requests began in 2013. One of the variances in the request was granted, but O'Boyle was sent a letter of denial pertaining to the other three requests on March 24, 2013.

57.     From February 2013 to July 2013, Martin O'Boyle filed hundreds of public records requests with the Town, overwhelming the records custodian with a nearly constant barrage of requests. When the Town's limited staff could not keep up with the records requests in what Martin O'Boyle believed to be a reasonable period of time, he began filing public records lawsuits.

58.     From April to July 2013, Martin O'Boyle filed approximately 16 public records lawsuits in his name and that of his affiliated entities, including Defendants Commerce Group and AH.  Many were filed as separate actions on the same day to further burden the Town in responding to the complaints and to increase the costs of the litigation.

59.     In July 2013, the Town settled with Martin O'Boyle and paid him $180,000.00, an amount Martin O'Boyle claimed to have accrued in attorney's fees although his suits had been prosecuted *pro se*.

60.     As a result of the foregoing experiences, and with Jonathan O'Boyle having graduated from law school in 2012, Martin O'Boyle and Jonathan O'Boyle realized that they

could use the Public Records Act not just to frustrate the workings of city governments,  but also to generate an ill-gained profit for themselves.   Thus, no longer was Martin O'Boyle's goal simply to torment local governments, bullying them into caving to his demands. The purpose was now to extort money.

61.      In or around January 2014, Martin O'Boyle and his son, Jonathan O'Boyle, met for the purposes of developing a scheme to defraud and extort whereby they would form one or more contrived not-for-profit corporations. The purpose of the not-for-profit corporations would be to file thousands of public records requests with municipalities, government entities and state contractors throughout the State of Florida.  Receipt and review of the requested records was not the O'Boyle's priority.  What Martin O'Boyle and Jonathan O'Boyle were really interested in was trying to cause the recipient of the public records request to overlook the request and then slap the recipient with a lawsuit or pre-suit settlement demand for an amount far in excess of their costs and fees and from which they would pocket a generous profit.

> ii.   *Creation of the O'Boyle Law Firm and Its Feeder Individuals and Entities.*

62.      Accordingly, and despite the fact that Jonathan O'Boyle was not a Florida lawyer, he opened and ran the O'Boyle Law Firm as a foreign profit corporation on February 10, 2014. This law firm was opened and operated from his father's corporate offices of the Commerce Group, located in Deerfield Beach Florida. Both Martin O'Boyle and Commerce Group financed all activities of the O'Boyle Law Firm.

63.      Once they had the law firm in place, Martin O'Boyle, Jonathan O'Boyle, and the O'Boyle Law Firm required "clients" —pre-textual plaintiffs that they could use in sending out frivolous and fraudulent public records requests and accompanying lawsuits.  Accordingly,

Martin O'Boyle and Jonathan O'Boyle, along with Ring and DeMartini, decided to activate several of Martin O'Boyle's dormant corporations and not-for-profits, and to form several new not-for-profit entities, including Defendants CAFI, OPR, and PAI, as a front to make public records requests and create litigation for the O'Boyle Law Firm which then could be used to defraud and extort Class Members into paying inflated settlement amounts and line their pockets with the proceeds derived therefrom.

64.     Martin O'Boyle, Jonathan O'Boyle, Ring and DeMartini knew that they could not, on the surface, own and control the non-profits they now intended to create as well as the law firm to which all of the so-called "clients" would be referred.  So, to further wrap their scheme to defraud and extort in a shroud of legitimacy, they needed someone who is familiar with government transparency—someone that had vast experience in making public records request and someone with a reputation for doing so.  They found that someone in Joel Chandler.

**b.  Joel Chandler is Used to Lend Legitimacy To the Scheme To Defraud and Extort.**

65.     In January 2014, Martin O'Boyle and Jonathan O'Boyle contacted Joel Chandler (hereinafter referred to as "Chandler"). At the time Chandler had been working as a self-employed civil rights and public information activist. Chandler had considerable experience in making public records requests and in public records request litigation throughout the State of Florida, and had garnered a reputation as being a government transparency advocate.

66.     Chandler was invited to the O'Boyle home in Gulf Stream, Florida, where both Martin and Jonathan O'Boyle resided. At the initial meetings, Chandler, the O'Boyles, and Witmer discussed the O'Boyle Law Firm's capacity for handling public records litigation throughout the state.

RICHMAN GREER, P.A.

Miami • West Palm Beach

67.     As a result of the meetings, Martin O'Boyle incorporated an alleged not-for-profit entity. Now, Martin O'Boyle and his various entities were funding not only the O'Boyle Law Firm, but also a feeder organization—CAFI.[6]

68.     Martin O'Boyle, on his own and through his other entities, provided actual cash to CAFI and the O'Boyle Law Firm as well as other consideration such as free rent, use of employees, and vehicles.  To do this, Martin O'Boyle used both his own personal assets, and the assets of his business, Commerce Group.

69.     Martin O'Boyle caused the entity, CAFI, to be incorporated in Florida and directed that his three close business associates, William Ring, Denise DeMartini, and Brenda Russell be named as the board of directors.

70.     Martin O'Boyle also agreed with Chandler that he would hire Chandler to serve as the Executive Director of CAFI at a six-figure salary as well as substantial benefits.  .

71.     Chandler's actual duty was to travel the state making hundreds of public records requests to public entities and state contractors. Thereafter, any evidence that would serve as a pretext for a lawsuit was to be forwarded immediately to Jonathan O'Boyle for the filing of litigation. Both CAFI and the O'Boyle Law Firm were operating from a room located in Commerce Group's offices.

72.     Prior to meeting the O'Boyles, Chandler had earned approximately $5,000.00 during the year 2013. Upon opening the alleged foundation, Martin O'Boyle agreed to pay Chandler $120,000.00 per year and to provide him with a car to drive around the state to make public records requests. Martin O'Boyle advised Chandler that he would entirely fund the

---

[6] So-called "Feeder" relationships have previously drawn the scrutiny of the Florida Bar, which has found them to be unethical (*See* FL Eth. Op. 02-8).

foundation and law firm on an unlimited basis, including the payment of all court filing fees. Martin O'Boyle, Jonathan O'Boyle, Ring and DeMartini did not tell Chandler at the time, but had planned that they were going to require that all of CAFI's clients be represented by the O'Boyle Law Firm, that Chandler would not have exclusive control over whether a claim is settled and for how much, and that the O'Boyle Law Firm, CAFI, Martin O'Boyle, and Jonathan O'Boyle intended to obtain fraudulent settlements from unwitting defendants by claiming their fees and costs are an amount far in excess of what they actually were.

73.     On January 27, 2014, Chandler was hired to act as Executive Director and CAFI was incorporated.

74.     As instructed, and in furtherance of the scheme to defraud and extort, albeit unwittingly, Chandler began creating public records requests and legal claims and referred these to the newly created O'Boyle Law Firm.

### c. O'Hare's Involvement.

75.     In or about 2013, Chandler had previously met with Defendant Christopher O'Hare to discuss public records litigation. O'Hare was upset with the Town over the denial of his zoning application regarding construction of a metal roof.

76.     In an attempt to force the Town to approve his roof, O'Hare recruited Chandler and along with the co-Defendants began to inundate the Town with public records requests.

77.     O'Hare met regularly with Martin O'Boyle and Jonathan O'Boyle and agreed to work in concert with them and to file hundreds of public records requests in his own name as well as under fictitious names with the clerk for the Town of Gulf Stream.

78.     O'Hare further agreed that after the Town was incapacitated and unable to timely and fully respond to the public records requests, the O'Boyle Law Firm would represent him in litigation against the Town, to generate money for the firm and the members of the Enterprise.

79.     O'Hare began making public records requests to the Town in July 2013.

80.     Initially, those public records requests were made by O'Hare in his own name or using anonymous email addresses ultimately determined to be associated with O'Hare.[7]

81.     Although O'Hare would make numerous requests in a single day, the Town initially did not assess any special service charges to him for extensive use of information technology resources or extensive clerical or supervisory assistance before making responsive records available.

82.     In response to sixty (60) individual public records requests O'Hare submitted to the Town in a single day - on January 16, 2014, the Town wrote to O'Hare to advise that since August 2013, O'Hare had made more than 500 public records requests, that the Town had already spent more than 200 hours responding to Mr. O'Hare's prior requests, that O'Hare had failed to retrieve the vast majority of documents gathered by the Town in response to his requests, and that O'Hare had failed to pay the copy charges associated with those documents that had been made available or to pay estimates associated with other requests.

83.     Thereafter, the Town began to assess special service charges against O'Hare for his extensive use of information technology resources and/or extensive clerical or supervisory assistance associated with responding to his requests.

---

[7] *See* note 3, *supra*

84.     To avoid those special service charges associated with the time spent responding to requests from a single individual and make the Town believe that numerous individuals were requesting records, O'Hare began making public records requests in a single day or within a few days to the Town using fictitious or fraudulent personal identification. The fraudulent aliases used by O'Hare, many of which mock the names of Town officials including Town Manager Bill Thrasher, Mayor Scott Morgan and Commissioners Donna White, Joan Orthwein and Robert Ganger, include:

Irnawaty Tirtarahardja            irnawatyt@gmail.com[8]
Janto Djajaputra                  jantodjajaputra@gmail.com[9]
Rodrigo Tejera                    tejeratejeratejera@gmail.com[10]
Nevada Smith                      nevadasmithcowboy@gmail.com[11]
Frank Smith                       frank.smith.iconoclast@gmail.com[12]
Hokuikekai Keihanaikukauakahihuliheekahaunaele
ll0i0i00lll0ii0llll00i0ii0llll@gmail.com
Buffy Howell                      buffyhowell@gmail.com
Bobby Gangrene                    bobbygangrene@gmail.com
Billy Trasher                     billytrasher@gmail.com

---

[8] When a cursor hovers over this email address, a link appears to chrisoharegulfstream@gmail.com. O'Hare has filed at least one public records lawsuit seeking recovery under the Public Records Act for a public records request filed in the name of Irnawaty Tirtarahardja. *See O'Hare v. Gulf Stream*, Case No. 2014CA008327XXXXMB AF (15th Judicial Circuit in and for Palm Beach County).

[9] When a cursor hovers over this email address, a link appears to chrisoharegulfstream@gmail.com. Moreover, O'Hare has filed public records lawsuits seeking recovery under the Public Records Act for a public records request filed in the name of Janto Djajaputra. *See O'Hare v. Gulf Stream*, Case No. 2014CA006848XXXXMB AB (15th Judicial Circuit in and for Palm Beach County); *O'Hare v. Gulf Stream*, Case No. 2014CA007516XXXXMB AD (15th Judicial Circuit in and for Palm Beach County).

[10] When a cursor hovers over this email address, a link appears to c@gmail.com. O'Hare has filed at least one public records lawsuit seeking recovery under the Public Records Act for a public records request filed in the name of Rodrigo Tejera. *See O'Hare v. Gulf Stream*, Case No. 2014CA006848XXXXMB AB (15th Judicial Circuit in and for Palm Beach County).

[11] When a cursor hovers over this email address, a link appears to chrisoharegulfstream@gmail.com.

[12] When a cursor hovers over this email address, a link appears to c@gmail.com.

RICHMAN GREER, P.A.

Miami • West Palm Beach

| | |
|---|---|
| Scotty Morgin | scottymorgin@gmail.com |
| Gonna White | gonnawhite@gmail.com |
| Freddy Farnsworth | Frederick.freddy.farnsworth@gmail.com |
| Groan Orthwein | groanorthwein@gmail.com |
| Americo Vespuchi | discover.the.record@gmail.com |
| Patrick Henry | no.gov.secrets@gmail.com |
| Wyatt Burp | ok.coral.record@gmail.com |
| Prigs Hypocrites | prigs.and.hypocrites@gmail.com |
| Harry LaFarge | lafargetech@gmail.com[13] |

85.     O'Hare has made hundreds of additional public records requests to the Town using fictitious or fraudulent personal identification and continues to do so in order to fraudulently induce the Town not to assess special service charges against him associated with the extensive use of resources and clerical or supervisory assistance.

86.     O'Hare has turned the nearly one thousand public records requests he has made against the Town into more than two dozen lawsuits.

87.     O'Hare has been a client of the O'Boyle Law Firm generally, and Jonathan O'Boyle in particular, since the firm's inception in January 2014. The O'Boyle Law Firm represents him in approximately 10 of the public records suits he has brought against the Town, with the first such suit filed by the O'Boyle Law Firm on his behalf on January 22, 2014.

88.     On May 8, 2014, O'Boyle and O'Hare formally joined forces as Plaintiffs against the Town with the filing of a Complaint to Enforce Florida's Public Records and Open Public Meetings Act. *See O'Boyle and O'Hare v. Town of Gulf Stream*, Case No.

---

[13] O'Hare has filed at least one public records lawsuit seeking recovery under the Public Records Act for a public records request filed in the name of Harry LaFarge. *See O'Hare v. Gulf Stream*, Case No. 2014CC012274XXXMB AB (15th Judicial Circuit in and for Palm Beach County).

2014CA005628XXXXMB AG (Circuit Civil Division, 15th Judicial Circuit in and for Palm Beach County).

### c. Chandler Realizes He is Being Used.

89.    Towards the end of March and in early April 2014, Chandler learned that Ring and Martin O'Boyle were making public records requests directed to the Town of Gulf Stream, allegedly at the behest of CAFI, without his knowledge or consent.

90.    In April 2014, when Chandler inquired as to why he was not informed about all lawsuits filed by CAFI, the organization over which he was the executive director, DeMartini explained to Chandler that she was Martin O'Boyle's key employee and the director on the board of CAFI to whom Chandler was to report. DeMartini further explained that she would be directing the flow of litigation to the O'Boyle Law Firm and that she would be calling the shots.

91.    DeMartini, a non-lawyer, attended law firm meetings with Chandler and participated in reviews of all client matters, not just CAFI cases. She made personnel decisions for the O'Boyle Law Firm and managed the alleged law firm's finances while claiming to be a board member of CAFI.

92.    During this same time, DeMartini demanded that Chandler produce a minimum quota of 25 new lawsuits a week for the O'Boyle Law Firm to file.

93.    In May 2014 DeMartini notified Chandler that she had full access to all of the O'Boyle Law Firm's internal records and client files. She shared all client reports with Chandler, not just reports concerning CAFI.

94.     After discovering that public records requests were being filed in the name of the foundation without his knowledge, Chandler again directed that all public records requests on behalf of CAFI be made by himself, or at the very least, that he be advised they are being made.

95.     On May 16, 2014, DeMartini asked Chandler for a recap of the number of cases referred by CAFI to the O'Boyle Law Firm from January through May.  DeMartini expressed her frustration to Chandler that he has only generated 211 cases in the 12 weeks since CAFI was created.

96.     During May 2014 Chandler learned that the O'Boyle Law Firm had no written fee agreements or engagement letters between the O'Boyle Law Firm and CAFI.

97.     By the end of May, DeMartini and Jonathan O'Boyle continued to express their frustration to Chandler. Chandler insisted on reviewing and verifying all lawsuits to be filed by CAFI. DeMartini and O'Boyle expressed concern that Chandler's review was slowing down the flow of litigation generated by the firm.

98.     By this point, it had become abundantly clear to Chandler that DeMartini, Ring and O'Boyle were only concerned with the volume of cases that could be generated, and of course the profits that could be had in such cases by way of fraudulent settlement demands, rather than any public service.  This suspicion was confirmed when Chandler's repeated attempts to inform Ring and DeMartini of opportunities to work with civil rights groups, public agencies, student groups and journalists on open government issues were completely ignored.

99.     In June 2014, it came full circle. Chandler learned that Martin O'Boyle, Jonathan O'Boyle, the O'Boyle Firm, Commerce Group, CAFI, Ring, and DeMartini were operating a

RICO Enterprise that was engaged in a scheme to defraud and extort the defendants with the hundreds if not thousands of public records requests that were made.

100.   The scheme involved the firm demanding monetary settlements on behalf of CAFI (or others) far beyond the actual attorneys' fees and expenses incurred and contemplated in F.S. §119.12, and to keep all of the proceeds, including the "windfall". If the demands were not met, then the scheme called for intimidation via threat of additional bogus public records requests and frivolous litigation until the demands were met.

101.   On June 30, 2014 Chandler arrived at the Commerce Group/CAFI/O'Boyle Law Firm office and presented his letter of resignation to Ring. Immediately thereafter, Martin O'Boyle demanded that Chandler retract his statement (in an email) confirming Jonathan O'Boyle's complicity in the scheme to defraud and extort. Martin O'Boyle threatened Chandler that if he did not retract his statements concerning Jonathan O'Boyle's involvement in the "windfall" scheme, Chandler would "force us to respond by making your life very unpleasant". Thereafter Chandler refused to retract the emails and Martin O'Boyle repeated his threats several times.

102.   As part of the scheme, the O'Boyle Law Firm has now filed hundreds of spurious lawsuits on behalf of O'Boyle, O'Hare, CAFI, and other pretextual entities and individuals including Defendants CG, SDG, OPR, PAI, AH, Commerce GP, CGA, CRO, AE, CRG. These defendants have become engaged in a massive scheme to generate and collect attorneys' fees from Florida agencies and state contractors beyond any fees actually earned.

### d.  How the scheme operates: the Example of Gulf Stream.

103.     The Town Of Gulf Stream has become the epicenter of the RICO Enterprises' scheme—a sort of example, of what the Enterprise will do to all Class Members if allowed to continue with its pattern of racketeering activity.

104.     Through the RICO Enterprise, Defendants have joined forces to barrage the Town with nearly 2,000 public records requests from fictitious e-mail addresses and purported not-for-profits. (See Composite Exhibit "B.")  Shortly thereafter, Defendants file suit against the Town, asserting unreasonable delay and seeking fees under the Public Records Act.  At the same time, they threaten the Town that if it will not settle, it will be faced with hundreds of additional public records requests and dozens of lawsuits, along with the crippling associated costs of both.

105.     For instance, in the first 28 days of September, 2013, the Town received 121 public records requests or approximately 6 requests per business day. All of those requests were made by Defendant Chris O'Hare (115) or Joel Chandler (6). With the exception of two requests made by O'Hare's attorney, Lou Roeder, Esq., all of O'Hare's requests were made to the Town by inconspicuous e-mail addresses that failed to indicate the requests were made on behalf of O'Hare:        emailfinder.mail.mail@gmail.com,        publicdocsearch@gmail.com, permit.record.search@gmail.com,        record.public@yahoo.com,        and        account-information@pacificwest.com.

106.     O'Hare's requests were not spread over time; instead, he barraged the Town with multiple requests in a single day, *e.g.*, 18 requests on September 4, 2013, 24 requests on September 20, 2013 and 58 requests on September 23, 2013. (See Composite Exhibit "B.")  On September 29, 2013, a Sunday, O'Hare sent the Town approximately 40 public records requests

in a four (4)-hour period. The Town responded to the requests, producing documents, providing estimates of fees authorized by the Public Records Act or advising O'Hare that no responsive documents existed. O'Hare ultimately filed 7 lawsuits over those September 29, 2013, requests, alleging that the Town unreasonably delayed in responding to his requests, and has continued to litigate those suits solely to extract settlement payouts from the Town -- even though documents have been produced, he has failed to pay the required estimates or he has been unable to identify responsive records that exist but were not produced.

107.    In the first 20 days of January 2014, O'Hare made approximately 94 public records requests to the Town by e-mail. Then, on January 21, 2014, O'Hare and O'Boyle joined forces to hit the Town with 15 public records requests in a single day; O'Hare making his requests by e-mail and O'Boyle making his in person. One of these was a request by O'Boyle for a copy of the Town's sign-in-log. Although the Town produced the record to O'Boyle in less than 2 business days, the newly formed O'Boyle Law Firm seized on the opportunity to sue the Town on O'Boyle's behalf, asserting unreasonable delay and seeking attorney's fees.

108.    By June 2014, the Enterprise had made more than 1,000 public records requests to the Town and filed more than two dozen public records suits against it, including more than one dozen suits seeking statutory attorneys' fees filed by The O'Boyle Law Firm. In the month of June 2014 alone, the Enterprise hit the Town with approximately 180 public records requests. These requests were made by e-mail from Defendants O'Hare (using fictitious names), O'Boyle, CAFI, SDG, CGA, AH and Commerce GP. As noted *infra*, O'Boyle and O'Hare then appeared at the July 11, 2014 Town Commission meeting overtly threatening to cause the Town to spend increased legal fees or settle with him at risk of continued public records requests and lawsuits.

### e. How the scheme operates: the example of Wantman Group.

109.   On Saturday, April 19, 2014, Wantman Group received an email from "An Onomy" seeking the "Certificate of Insurance referenced on Page 6 of 16 of the South Florida Water Management District contract 4600002690."   A true and correct copy of the email is attached as part of **Composite Exhibit "D."**

110.   Approximately 3 weeks later, on or around May 8, 2014, and without any further inquiry to the Wantman Group, including a simple confirmation that the public records request was in fact received, CAFI, through its attorneys, Defendants Taylor and the O'Boyle Law Firm, filed a two-count complaint seeking a copy of the requested record, an immediate hearing, a declaration that Wantman Group violated Section 119.11, and of course, an award of attorneys' fees and costs.   A true and correct copy of the two-count complaint is attached hereto as part of Composite Exhibit "D."

111.   In response to the two-count complaint, Wantman Group, through counsel, sent a letter advising Mr. Taylor and CAFI that "Wantman was not aware of the Chapter 119 request," as it was sent to an obscure individual and not the records custodian of Wantman.  The letter also attached a copy of the requested document "in the spirit of cooperation," and demanded that the lawsuit be dismissed.   A true and correct copy of the May 29, 2014 letter from counsel is attached hereto as part of Composite Exhibit "D."

112.   Before Wantman Group even filed its Answer and Defenses to the complaint, Defendants Taylor, O'Boyle Law Firm, and CAFI sent an email to Wantman Group's counsel offering to settle the public records dispute for $3,923.00.   A true and correct copy of the email

and attached draft settlement agreement from Defendants Taylor, O'Boyle Law Firm and CAFI is attached hereto as part of Composite Exhibit "D."

113.    Notwithstanding the document had now been produced voluntarily, Defendants Taylor, the O'Boyle Law Firm, and CAFI refused to dismiss the lawsuit, requiring Wantman Group to Answer the same.

114.    Upon receipt of the Answer, Defendants Taylor, O'Boyle Law Firm, and CAFI immediately sent form discovery (not even tailored to the Wantman Group, but containing things completely inapplicable to Wantman) as an indirect threat that more litigation is to follow if the settlement demands are not assented to.

115.    In all, Wantman Group has incurred substantial damages in having to respond to the bogus records request and then defend against the frivolous litigation.

116.    This scheme to defraud and extort has directly injured the Class members as well as the Plaintiffs.  To date, Gulf Stream has been injured in the amounts and categories set forth in **Composite Exhibit "E"** and **Exhibit "F"** hereto.

117.    In light of the foregoing, Plaintiffs were damaged as a direct result of the RICO Enterprise based on Defendants' fraudulent claims, backed-up by Defendant's extortion and threats calculated to cause Class Members to spend money responding to bogus public records requests and defending frivolous lawsuits.

**VI.    COUNT I—Violation of 18 U.S.C. § 1964(a) and (c).**

118.    Plaintiffs' adopt and incorporate by reference paragraphs 1 through 117 above as though fully set forth herein.

119.     Plaintiffs' seek relief under 18 U.S.C. § 1964(a) of RICO to prevent and restrain Defendants from committing future violations of section 1962, including, but not limited to, ordering the Defendants to divest themselves of their interest in the Enterprise; impose reasonable restrictions on the future activities or investments of the Defendants to ensure no further engagement in a similar endeavor as described herein; and order dissolution of all corporate defendants.

120.     Plaintiffs also seek relief under 18 U.S.C. § 1964(c) of RICO, and seek threefold the damages sustained by the Plaintiffs and the Class Members, along with costs of this suit, including a reasonable attorney fee.

121.     The Plaintiffs, and each Class Member that Plaintiffs represent are persons within the meaning of 18 U.S.C. § 1964(c) and § 1961(3).

122.     18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."   Through § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee…."   Because the Plaintiffs, along with the Class Members, were injured in their business or property by Defendants' violation of 1962, they are entitled to threefold their damages, attorneys' fees and costs.

a.   **The Enterprise.**

123.    The Defendants, through themselves and through their employees and agents, formed a union and association-in-fact enterprise that engages in, and the activities of which affect, interstate commerce.  This Enterprise has as its goal, a scheme to defraud and intimidate through acts of extortion, municipalities, municipal agencies, private contractors of municipalities and anyone else subject to, or even arguably subject to, the Sunshine Law, into paying unjustified, grossly inflated and fraudulent settlement amounts so as to create and increase profits to the Enterprise.

124.    Every Defendant had a role or position in the Enterprise, all of which worked together towards the common goal of defrauding or extorting municipalities, municipal agencies, private contractors of municipalities and anyone else subject to or even arguably subject to the Sunshine Law.  The Defendants' respective roles and their importance to the Enterprise, as well as how it advanced the interest of the Enterprise are as follows:

a. **Martin O'Boyle**:  Martin O'Boyle is one of the engineers of the Enterprise's scheme to defraud and extort, as well as its principal financier through his various business entities.  Martin O'Boyle directs the Enterprise, and is responsible for the following actions taken to advance the goal of the Enterprise:

   i. Financing the opening and continued existence of the O'Boyle Law Firm, along with his son, Jonathan O'Boyle;

   ii. Financing the opening and continued existence of CAFI, OPR and PAI;

   iii. Directing the operations of CAFI, OPR and PAI through his appointed directors and key employees of his other business entities such as Commerce Group.

    iv.  Utilizing his other business entities including Commerce Group, SDG, AH, CGA, CRO, AE and CRE to make spurious, frivolous, and baseless public records requests and to file resulting lawsuits to either generate windfall fees for himself, Jonathan O'Boyle, Ring, DeMartini and the O'Boyle Law Firm; or to extort a settlement payment for the victims.

    v.  Mandating, under threat of no funding, that:

      1.  CAFI file no less than 25 cases per week;

      2.  All cases filed by CAFI and the other Defendants be referred to the O'Boyle Law Firm; and,

      3.  All cases be settled for an amount substantially in excess of the fees and costs incurred in the case.

b. **Jonathan O'Boyle**.  Jonathan O'Boyle is one of the engineers of the Enterprise's scheme to defraud and extort, along with his father Martin O'Boyle.  To advance the interest of the Enterprise, Jonathan O'Boyle has taken the following actions:

    i.  Creating, and sustaining the O'Boyle Law Firm, a necessary element of the Enterprise;

    ii.  Filing spurious, frivolous, and baseless public records requests as well as resulting lawsuits solely to generate windfall fraudulent and extortive fees for Martin O'Boyle, Jonathan O'Boyle, Ring, DeMartini and the O'Boyle Law Firm;

    iii.  Directing the prosecution of hundreds of public records suits filed by the O'Boyle Law Firm throughout the State of Florida on behalf of other

members of the Enterprise including, but not limited to, his father Martin O'Boyle, O'Hare, CAFI, Commerce Group, OPR, PAI, AH, CGA, CRO, AE, and CRG.

iv. Ordering that public records suits be filed on behalf of Florida plaintiffs, such as Chandler, without knowledge or consent of the Plaintiffs; and,

v. Ordering that, as a pattern and practice, all public records suits would be settled for an amount substantially in excess of the actual fees and costs incurred to generate a profit for the Enterprise, and directing that settlement demands be made by the O'Boyle Law Firm to the Class Members in accordance with this pattern and practice using the mail or wires.

c. **Christopher O'Hare**.   Christopher O'Hare has taken the following actions to advance the Enterprise's scheme to defraud:

i. Filing spurious, frivolous, and baseless public records requests as well as resulting lawsuits solely to generate fees for himself, Martin O'Boyle, Jonathan O'Boyle and the O'Boyle Law Firm and,

ii. Fraudulently misrepresenting his identity in order to induce violation of the Public Records Act and to avoid fees owed by him thereunder.

d. **William Ring**. William Ring is one of the engineers of the Enterprise's scheme to defraud and extort, having served as Martin O'Boyle's "right-hand" for more than 25 years.  To advance the interest of the Enterprise, Ring has taken the following actions:

   i. Assisting with the creation of not-for-profit Defendants CAFI, PAI and OPR for the sole purpose of generating fraudulent, extortive and windfall attorney's fees by the filing and prosecution of frivolous public records lawsuits;

  ii. Directing the operations of CAFI through key employees of Martin O'Boyle's other business entities such as Commerce Group.

 iii. Mandating under threat of no funding, that:

     1. All cases filed by CAFI and the other Defendants be referred to the O'Boyle Law Firm; and,

     2. All cases be settled for an amount substantially in excess of the fees and costs incurred in the case.

  iv. Filing spurious, frivolous, and baseless public records requests as well as resulting lawsuits solely to generate fees for Martin O'Boyle, Jonathan O'Boyle, Ring, DeMartini and the O'Boyle Law Firm;

   v. Ordering, that as a pattern and practice, all public records suits would be settled for an amount substantially in excess of the actual fees and costs incurred to generate a profit for the Enterprise; and,

  vi. Purporting to serve as the Florida supervising attorney of the O'Boyle Law Firm (notwithstanding his total lack of litigation experience) in order to hide the fact that non-Florida attorney Jonathan O'Boyle is truly directing the firm's activities, all in violation of the Rules Regulating the Florida Bar.

e. **Denise DeMartini**. Denise DeMartini is one of the engineers of the Enterprise's scheme to defraud and extort, having served as Martin O'Boyle's "left-hand" for more than 25 years. To advance the interest of the Enterprise, DeMartini has taken the following actions:

   i. Assisting with the creation of not-for-profit Defendants CAFI, PAI and OPR for the sole purpose of generating fraudulent, extortive and windfall attorney's fees by the filing and prosecution of frivolous public records lawsuits;

   ii. Directing the operations of CAFI through key employees of Martin O'Boyle's other business entities such as Commerce Group.

   iii. Mandating under threat of no funding, that:

       1. CAFI file no less than 25 cases per week;

       2. All cases filed by CAFI and the other Defendants be referred to the O'Boyle Law Firm; and,

       3. All cases be settled for an amount substantially in excess of the fees and costs incurred in the case.

   iv. Ordering, that as a pattern and practice, all public records suits would be settled for an amount substantially in excess of the actual fees and costs incurred to generate a profit for the enterprise; and,

   v. Managing the operations of the O'Boyle Law Firm while simultaneously serving as an officer of its clients, including CAFI, and sharing confidences of those clients.

RICHMAN GREER, P.A.

Miami • West Palm Beach

f.   **Commerce Group.** To advance the interest of the Enterprise, Martin O'Boyle's real estate development company, the Commerce Group, has taken the following actions:

   i.   Financing the opening and continued existence of the O'Boyle Law Firm and the not-for-profit Defendants CAFI, OPR and PAI; and,

   ii.  Filing spurious, frivolous, and baseless public records requests as well as resulting lawsuits solely to generate fees for Martin O'Boyle, Jonathan O'Boyle, Ring, DeMartini and the O'Boyle Law Firm.

g.   **Public Awareness Institute, Inc.** To advance the interests of the Enterprise, the Florida not-for-profit PAI has taken the following actions:

   i.   Incorporating as a Florida not-for-profit corporation for the sole purpose of generating windfall attorney's fees by the filing and prosecution of frivolous public records lawsuits; and,

   ii.  Filing spurious, frivolous, and baseless public records requests as well as resulting lawsuits solely to generate windfall fees for Martin O'Boyle, Jonathan O'Boyle, Ring, DeMartini and the O'Boyle Law Firm.

h.   **Citizens Awareness Foundation, Inc.** To advance the interests of the Enterprise, the Florida not-for-profit CAFI has taken the following actions:

   i.   Incorporating as a Florida not-for-profit corporation for the sole purpose of generating windfall attorney's fees by the filing and prosecution of frivolous public records lawsuits; and,

ii. Filing spurious, frivolous, and baseless public records requests as well as resulting lawsuits solely to generate fraudulent, extortive, and windfall fees for Martin O'Boyle, Jonathan O'Boyle, Ring, DeMartini and the O'Boyle Law Firm.

i. **Our Public Records, LLC.** To advance the interests of the Enterprise, the Florida not-for-profit OPR has taken the following actions:

i. Incorporating as a Florida not-for-profit corporation for the sole purpose of generating windfall attorney's fees by the filing and prosecution of frivolous public records lawsuits; and,

ii. Filing spurious, frivolous, and baseless public records requests as well as resulting lawsuits solely to generate fraudulent, extortive and windfall fees for Martin O'Boyle, Jonathan O'Boyle, Ring, DeMartini and the O'Boyle Law Firm.

j. **Stopdirtygovernment, LLC**. To advance the interests of the Enterprise, SDG has filed spurious, frivolous, and baseless public records requests as well as resulting lawsuits solely to generate fraudulent, extortive and windfall fees for Martin O'Boyle, Jonathan O'Boyle, Ring, DeMartini and the O'Boyle Law Firm.

k. **Airline Highway, LLC**. To advance the interests of the Enterprise, AH has filed spurious, frivolous, and baseless public records requests as well as resulting lawsuits solely to generate fraudulent, extortive and windfall fees for Martin O'Boyle, Jonathan O'Boyle, Ring, DeMartini and the O'Boyle Law Firm.

l.  **Commerce GP, Inc.**. To advance the interests of the Enterprise, Commerce GP has filed spurious, frivolous, and baseless public records requests as well as resulting lawsuits solely to generate fraudulent, extortive and windfall fees for Martin O'Boyle, Jonathan O'Boyle, Ring, DeMartini and the O'Boyle Law Firm.

m.  **CG Acquisition Co., Inc.** To advance the interests of the Enterprise, CGA has filed spurious, frivolous, and baseless public records requests as well as resulting lawsuits solely to generate fraudulent, extortive and windfall fees for Martin O'Boyle, Jonathan O'Boyle, Ring, DeMartini and the O'Boyle Law Firm.

n.  **CRO Aviation, Inc.**. To advance the interests of the Enterprise, CRO Aviation, Inc. has filed spurious, frivolous, and baseless public records requests as well as resulting lawsuits solely to generate fraudulent, extortive and windfall fees for Martin O'Boyle, Jonathan O'Boyle, Ring, DeMartini and the O'Boyle Law Firm.

o.  **Asset Enhancement, Inc**. To advance the interests of the Enterprise, Asset Enhancement, Inc. has filed spurious, frivolous, and baseless public records requests as well as resulting lawsuits solely to generate fraudulent, extortive and windfall fees for Martin O'Boyle, Jonathan O'Boyle, Ring, DeMartini and the O'Boyle Law Firm.

p.  **Commerce Realty Group, Inc**. To advance the interests of the Enterprise, CRG has filed spurious, frivolous, and baseless public records requests as well as resulting lawsuits solely to generate fraudulent, extortive and windfall fees for Martin O'Boyle, Jonathan O'Boyle, Ring, DeMartini and the O'Boyle Law Firm

q. **The O'Boyle Law Firm**. At the center of the Enterprise's scheme to defraud, the O'Boyle Law Firm has taken the following actions to advance the Enterprise's interests:

    i. Profiting from improper illegal, and unethical feeder and fee-sharing relationships and sharing space with its non-lawyer clients, including Defendants Commerce Group, CAFI, OPR and PAI;

    ii. Filing spurious, frivolous, and baseless public records requests as well as resulting lawsuits on behalf of its feeder clients, all of which are entities affiliated with and funded by the Enterprise or its members; and,

    iii. Using the mail and wires to demand that putative Class Members settle public records lawsuits in an amount substantially in excess of the actual fees and costs incurred to generate a profit for the Enterprise and fraudulently misrepresenting the amount of those fees and costs.

r. **Ryan Witmer**. Ryan Witmer is one of the engineers of the Enterprise's scheme to defraud, along with his law school classmate and friend Jonathan O'Boyle. To advance the interest of the Enterprise, Witmer took the following actions:

    i. Creating the O'Boyle Law Firm and agreeing to serve as its purported Florida supervising attorney in order to hide the fact that non-Florida attorney Jonathan O'Boyle is truly directing the firm's activities, all in violation of the Rules Regulating the Florida Bar;

    ii. Causing the O'Boyle Law Firm to profit from improper illegal and unethical feeder and fee-sharing relationships and to share space with its

non-lawyer clients, including Defendants Commerce Group, CAFI, OPR and PAI;

   iii.  Facilitating the unlicensed practice of law by Jonathan O'Boyle;

   iv.  Filing spurious, frivolous, and baseless public records requests as well as resulting lawsuits; and,

   v.  Using the mail and wires to demand that putative Class Members settle public records lawsuits in an amount substantially in excess of the actual fees and costs incurred to generate a profit for the Enterprise and fraudulently misrepresenting the amount of those fees and costs.

s.  **Giovani Mesa**. An attorney with the O'Boyle Law Firm, Mesa has taken the following actions to advance the Enterprise's scheme to defraud:

   i.  Filing spurious, frivolous, and baseless public records requests as well as resulting lawsuits; and,

   ii.  Using the mail and wires to demand that putative Class Members settle public records lawsuits in an amount substantially in excess of the actual fees and costs incurred to generate a profit for the Enterprise and fraudulently misrepresenting the amount of those fees and costs.

t.  **Nickalaus Taylor**. An attorney with the O'Boyle Law Firm, Taylor has taken the following actions to advance the Enterprise's scheme to defraud:

   i.  Filing spurious, frivolous, and baseless public records requests as well as resulting lawsuits; and,

ii.  Using the mail and wires to demand that putative Class Members settle public records lawsuits in an amount substantially in excess of the actual fees and costs incurred to generate a profit for the Enterprise and fraudulently misrepresenting the amount of those fees and costs.

125.    The members of the Enterprise set forth above, function in a fashion so as to become a continuing unit which furnishes a vehicle for the commission of the racketeering activity set forth below.  The continuity of the Enterprises' actions will be repeated in the future if it is allowed to continue.

**a.  Pattern of Racketeering.**

126.    Pursuant to 18 U.S.C. § 1961(1), "racketeering activity" includes the predicate crimes of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and extortion (18 U.S.C. 1951).  Under to 18 U.S.C. § 1341, "whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises…for the purpose of executing such scheme or artifice or attempting so to do" and uses the mails or other commercial carrier to do so, commits mail fraud. Similarly, under 18 U.S.C. § 1343, "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire," commits wire fraud.  Under 18 U.S.C. § 1951, extortion is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear (including fear of economic loss) …."

127.    All members of the Enterprise have committed at least one predicate act of mail fraud, wire fraud, or extortion, which, when combined, constitutes a pattern of racketeering undertaken by the Enterprise to accomplish the goals of the Enterprise.  Examples of predicate acts by each member of the Enterprise is set forth on the charts attached hereto as Composite Exhibit "B"[14] and Exhibit "F." (these charts are exemplary, and by no means exhaustive).  In addition to the mail and/or wire fraud predicate acts committed by the RICO Enterprises' members, O'Hare and Martin O'Boyle have blatantly threatened to cause the Town to spend increased legal fees or settle.

128.    For example, at the July 11, 2014 Town Commission Meeting, O'Boyle said to the commissions; "why would you spend $1,700 when on your very best day, best day you win $450? …You want to lower the legal fees, you want to get rid of the lawyer fees?  What you spent you could have settled with this guy [O'Hare]…You would have spent half the money and everyone would have been happy."

129.    At this same meeting, Martin O'Boyle, when addressing the Town's budget, suggested that "you won't have to worry about millage rate" if the Town would "sit down and try to solve" the issues with O'Hare—described by O'Boyle as "the guy that wants to do nothing but file law suits…."

130.    However, Mr. O'Hare's most obvious act of extortion occurred at a September 12, 2014 Commission Tentative Budget Hearing, when, while referencing the outstanding public records requests, he stated: "There's a lot on the board and a lot more comin'.  Be so much easier just to get this settled instead of spending more money each time the lawyers write a letter than it

---

[14] Unless otherwise indicated, each of the Public Records request contained in Composite Exhibit "B" was made via email or facsimile and constitutes a use of the wires.

**RICHMAN GREER, P.A.**

Miami • West Palm Beach

would take to settle some of these things."  A month later, Mr. O'Hare reiterated these threats at the October 10, 2014 Town Commission meeting, stating that "So many of these cases could be resolved by just admitting guilt [and] paying the attorneys' fees….I meant a typical public records case settled for …..what was Joel Chandlers?  Was it $1,500 to make him go away?  And yet you spend $20,000 saying no, we're not guilty and we're not gonna cooperate.  That's just not a good use of public money."

131.    In addition to the verbal threats, Martin O'Boyle and O'Hare have also attempted mutiny-styled rallies of the citizens to try and pressure the Town into settling the scores of public records requests.  In January of 2015, Martin O'Boyle and O'Hare published the "Gulf Stream Patriot," a professionally prepaid bulletin in large part devoted to seeking support to force settlement of all of the public records lawsuits.  In this bulletin, O'Boyle and O'Hare suggest to the residents of the Town that: "Because of the stout costs, [of the public records litigation] the residents are the ones being punished!  Let's all hope a resolution is in sight; and the costs disappear."

132.    On the back page, the "Gulf Stream Patriot" states that the "hottest topic" in the Town right now is the public records litigation.  Accordingly, the bulletin then asks the readers to answer the following question in an online survey: "Are you in favor of the Town reaching a peaceful resolution with Mr. O'Boyle and Mr. O'Hare, which would end all the expenses and litigation in a prompt fashion?"

133.    Each of these statements made by either O'Boyle or O'Hare is an overt threat that additional frivolous public records requests and accompanying litigation will follow if the Town

does not agree to settle the current cases.   Accordingly, each of these statements is an act of extortion, carried out to further the goal of the scheme to defraud and extort.

134.   Each of these actions is a regular way of doing business for the enterprise's members and threatens repetition in the future.

### b.  Reliance.

135.   The frivolous and often inconspicuous public records requests, as well as the false and disguised identity of the requester, along with the fraudulent settlement demands that were sent by the mails and the wires were justifiably relied upon by Plaintiffs and Class Members when they paid the fraudulent and inflated settlement demands or when they retained additional staff and spent additional resources in responding to the same.

### c.  Proximate Cause and Damages.

136.   The wrongful conduct of the enterprise set forth above, including the acts of mail fraud, wire fraud, and extortion have directly harmed the Plaintiffs and the Class Members.   The Plaintiffs and the Class members were and are being extorted to pay inflated and fraudulent settlement demands based on the frivolous and often inconspicuous public records requests made by the enterprise, amounts they would not otherwise have paid.

137.   In addition, when the volume of the frivolous public records request began to increase exponentially as the scheme to defraud and extort progressed, the Plaintiffs and Class Members were forced to incur additional internal costs associated with having to try and respond to the same. See the spreadsheet attached hereto as Composite Exhibit "E," setting forth the amount of additional internal costs the Town was forced to absorb as a result of the Enterprises' pattern of racketeering.

**RICHMAN GREER, P.A.**

Miami • West Palm Beach

138.    Finally, the acts of extortion were directly intended to cause the Plaintiffs to spend money defending frivolous actions having no nexus or relation to the original settlement demands as to which they were being coerced to comply with and pay.  The Plaintiffs had a pre-existing right to be free from the threats of the previously unrelated public records requests and frivolous litigation, and the resolution of the threatened public records requests and litigation would not impact the resolution of the case in which the threats were made but for the extortionate nature of the threats.  The threatened public records requests and frivolous litigation were simply used as leverage to influence and gain compliance with fraudulent settlement demands made in unrelated cases—a tool to extort additional money from the Plaintiffs.  See the spreadsheet attached hereto as Exhibit "F" outlining the amount spent in defending against the frivolous public records requests and accompanying litigation brought to achieve a simple yet calculated goal of causing the Town to hemorrhage money and consider settling.

139.    There is no person who has more directly sustained these injuries than the Plaintiffs and Class Members, and the injuries are a direct and intended result of the enterprise's scheme to defraud the Plaintiffs, as well as the mail and wire fraud acts undertaken as part of the scheme to defraud the Plaintiffs and Class Members.

140.    Pursuant to 18 U.S.C. § 1964(c), Counter-Plaintiff requests an award of attorneys' fees and costs for having to bring the instant suit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of all other similarly situated, pray for relief and judgment as follows:

**RICHMAN GREER, P.A.**

Miami • West Palm Beach

47

a.  Certifying the proposed Class and approving Plaintiffs Town of Gulf Stream and Wantman Group, Inc. as class representatives;

b.  Appointing Richman Greer, P.A as class counsel;

c.  Awarding Plaintiffs and the Class treble damages in an amount to be proven at trial, along with costs, interest, an attorneys' fees; and

d.  Entering whatever orders the Court deems necessary to divesting the Defendants from their interest in the enterprise and imposing reasonable restrictions on the future activities or investments of the Defendants to prohibit them from engaging in a similar type endeavor;

e.  Awarding any further relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted this 12th day of February, 2015.

**RICHMAN GREER, P.A.**
*Counsel for Plaintiffs*
One Clearlake Centre, Suite 1504
250 Australian Avenue, South
West Palm Beach, Florida 33401-5016
Telephone: (561) 803-3500
Facsimile:  (561) 820-1608


By:____  */s/ Gerald F. Richman*_____
        GERALD F. RICHMAN
        Florida Bar No.:  066457
        grichman@richmangreer.com
        dcostonis@richmangreer.com
        ERIC M. SODHI
        Florida Bar No.: 0583871
        esodhi@richmangreer.com
        mramirez@richmangreer.com


**RICHMAN GREER, P.A.**

**Miami ● West Palm Beach**

48

LEORA B. FREIRE
Florida Bar No.: 0013488
lfreire@richmangreer.com

**RICHMAN GREER, P.A.**

Miami ● West Palm Beach